**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 1:18-cr-468-TSE** |
| **v.** | ) | |
| | ) | **Hearing Date: September 27, 2019** |
| **DAVID JAYRET SURIEL** | ) | |
| | ) | **The Honorable T.S. Ellis, III** |
| Defendant. | ) | |

### DEFENDANT DAVID JAYRET SURIEL'S POSITION ON SENTENCING

Defendant David Suriel is scheduled for sentencing on September 27, 2019, at 9:00 a.m.  I offer this memorandum to assist the Court to arrive at the appropriate sentence.

Mr. Suriel recognizes how serious his actions are, and he blames no one but himself. He formally accepted responsibility on April 18, 2019, to counts one and two of the indictment (18-CR-468), charging him with Conspiracy to Distribute and Possess With Intent to Distribute Cocaine and Attempted Possession With Intent to Distribute Cocaine, in violation of 21 U.S.C. §§846 and 841(a)(1) and (b)(1)(A).

The Government, Probation and I agree that the Court should begin its sentencing analysis at an advisory sentencing range of 57 to 71 months of imprisonment[1].  We respectfully suggest, however, that a sentence within that range would be far greater than necessary to achieve the objectives of sentencing.  Instead, considering the factors of 18 U.S.C. §3553(a), we believe that a sentence of time-served is sufficient to achieve the goals of sentencing.

---

[1] The Court should find no mandatory minimum, because, as noted in the presentence investigation report, Mr. Suriel satisfied the "safety valve" conditions of 18 U.S.C. §3553(f) and U.S.S.G. §5C1.2.

As the Court considers the whole person whom it will sentence, we ask Your Honor to find that Mr. Suriel's history and characteristics (18 U.S.C. §3553(a)(1)) warrant leniency, and that the requested sentence can adequately balance the goals of sentencing with the unique facts and circumstances of Mr. Suriel's life.

We wish to highlight in this memorandum the following:

(1) **Positive Work History** – Mr. Suriel has a strong and consistent work history; he has been gainfully employed since he was only 15 years of age (a 12-year period), including working at McDonald's, assisting his mother in running a daycare facility, and working as a delivery person for a beverage distribution company;

(2) **First Time Offender** – Mr. Suriel is a 26-year-old first-time offender with zero criminal history points who has accepted full responsibility for his short-lived and minor participation in the instant conspiracy; he was candid with the government about his misconduct during a safety-valve proffer, and has been a model defendant since his arrest more than nine months ago; Mr. Suriel presents almost no risk of recidivism;

(3) **Need to Avoid Disparity –** Mr. Suriel is the fourth defendant in this case to come before the Court for sentencing; two of the defendants sentenced before him have received sentences of a year and a day (Jose Jimenez and Melvin Acosta), and the other received a sentence of 24 months (Erwin Roa-Mustafa); both Jose Jimenez and Erwin Roa-Mustafa have higher Guidelines than Mr. Suriel, reflecting their more prominent roles in the offense; meanwhile, Melvin Acosta, who like Mr. Suriel received a minor role adjustment and who had the same Guidelines, is also distinguishable: he, unlike Mr. Suriel, was someone who contributed his own money (demonstrating an attempted ownership) towards the attempted purchase of narcotics and appears to have fewer mitigating circumstances in his history and characteristics than Mr. Suriel; we believe this justifies the brief reduction we are requesting between a 366 day sentence, which equates to approximately 10 months, and the requested sentence of time-served, which would be approximately 9.5 months;

(4) **Reputation In The Community** – As reflected in the 17 letters from members of the community, Mr. Suriel is a young man with a generous and caring nature who has made tremendous contributions to the lives of many; and

2

(5) **Eight-Month Old Son** – Mr. Suriel is the father of an eight-month-old son, O████ D████ S████, who was born on ████████ ██ ████, approximately six weeks after Mr. Suriel's arrest in this case, and who, by virtue of his incarceration and the distance from his family in New York, Mr. Suriel only knows from pictures and telephone calls; he is anxious to get home to his baby and be the father to him that he, himself, never had as a young man.

As discussed in greater detail below, the factors of 18 U.S.C. §3553(a) and the objectives of the parsimony clause demonstrate that the requested sentence meets the ends of justice.

## II. A Brief Overview of Sentencing Post-*Booker*

For the past 14 years, not only have courts had wide discretion to impose non-Guidelines sentences, (*see United States v. Booker*, 543 U.S. 220, 226-227 (2005)), but the "effectively advisory" Guidelines are not even to be "presumed reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009); *Gall v. United States*, 552 U.S. 38, 62 (2007). The Guidelines are only "the starting point and the initial benchmark" of a sentencing analysis. *Gall*, 552 U.S. at 49.  A district court conducts "its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008).

The sentencing factors are:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just

3

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentences and the sentencing range established for: (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

(5)    any pertinent policy statement – [...];

(6)    the need to avoid unwarranted    sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1)-(7).

Ultimately, of course, the overarching goal of sentencing is to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.

### III.    History & Characteristics of Mr. Suriel and the Nature & Circumstances of the Offense (§ 3553(a)(1))

*a.    Mr. Suriel's History & Characteristics*

David Suriel is only 26 years of age. He has lived nearly his entire life in Bronx County, New York. Shortly after he was born, Mr. Suriel was diagnosed with a kidney condition, and he and his mother relocated to Boston until he

was four years old so that he could receive necessary medical treatment. When Mr. Suriel had recovered, they moved back to Bronx County, New York. It was then that Mr. Suriel met his father for the first time. His parents were never married and maintained a dysfunctional relationship throughout Mr. Suriel's life. He was raised primarily by his mother, and despite her best efforts, in large part due to his father's destructive lifestyle, Mr. Suriel experienced a very difficult childhood.

Mr. Suriel's father has been addicted to drugs for more than 30 years. In particular, during Mr. Suriel's childhood, he suffered with addictions to cocaine and heroin. He was also physically abusive towards Mr. Suriel and his mother. Mr. Suriel recalls seeing a school counselor from the third through the sixth grades because of constant anxiety over his mother's safety and well-being while he was at school.

Despite the physical and psychological abuse, and the persistent drug abuse, Mr. Suriel's mother and father continued their volatile relationship throughout much of Mr. Suriel's childhood and adolescence. Their relationship produced another child, Mr. Suriel's brother, Mark, six years after Suriel was born. Fortunately for Mark, he never suffered the same abuse that characterized Mr. Suriel's life growing up.

Despite such a turbulent upbringing, Mr. Suriel was by all accounts a "good kid," who worked hard in school, even if he wasn't the smartest student. He graduated from the Dreamyard Preparatory School in February 2011. (*See* Exhibit A). Thereafter he pursued college courses at both Bronx Community

College and Hostos College. He was forced to withdraw from some of his classes based on his academic struggles. However, David did not stop pursuing additional educational opportunities. He applied and was accepted to APEX Technical School to study to be an air conditioning/refrigeration technician. APEX is a 900 hour program, and David completed more than 750 hours, attending part-time at night while working during the day. (*See* Exhibit B). He will return to APEX and complete the program upon his release.

Mr. Suriel, from the time he was only a boy, exhibited a desire and a willingness to work hard. From the ages of 15 to 16, he worked at McDonald's. Then, from the ages of 18 to 21, he worked for A & D Beer Distribution, a company owned by the mother of his three paternal half-siblings, as a delivery driver. And throughout his life, but full-time from the age of 22 until a few months prior to his arrest, Mr. Suriel worked with his mother who runs a daycare center out of her home.

During his time working at the daycare, Mr. Suriel took training courses focused on different aspects of early childhood education and how to provide a safe and nurturing environment for children. For Example, among others, Mr. Suriel participated in courses on: Managing Challenging Behavior: 18 Months to 36 Months; Managing Challenging Behavior: Birth to 18 Months; Early Intervention; School Age Child Care; Family Engagement; Emergency Preparedness; and Infant Brain Development. (*See* Exhibit C). He was also trained to identify child abuse and maltreatment, and certified as a Mandated

Reporter. (*See* Exhibit D). He was trusted by parents to safeguard their children, and he did an excellent job.

As a teenager and into his early 20's, despite many positive developments in his life, Mr. Suriel continued to struggle with anxiety and depression. When he was 19, following a particularly difficult breakup, he sank into a deep depression and could not eat or sleep. He eventually agreed to voluntarily admit himself into a hospital in Westchester, New York for treatment. He remained hospitalized for approximately two weeks, during which he was diagnosed with situational depression and prescribed anti-depressants. He continued outpatient treatment for the following two years, and again in 2016, when confronted with stress caused by his school loans and poor finances.

Approximately two years ago, Mr. Suriel met his now-partner, Chanter Fernandez, and they began a relationship. According to Ms. Fernandez: "David Suriel and I have been inseparable since the moment we met. David Suriel has been the most loving and caring guy I have ever met." (Exhibit E).

As their relationship progressed, they decided to have a baby together, and Ms. Fernandez became pregnant with their first child. The couple began cohabitating in August 2018, approximately four months before Mr. Suriel's arrest, and began to build a life together. They have plans to marry and are intent on raising their son together.

Ms. Fernandez recalls how loving and dedicated Mr. Suriel was throughout her pregnancy: "My entire pregnancy David Suriel catered to my every need. He would massage my feet, run to the store for any of my cravings

and he even would help me clean my home. My friends would be jealous of him because unlike their significant other David Suriel did things for me any other guy wouldn't." (Exhibit E).

This description of Mr. Suriel is consistent throughout the many letters submitted on his behalf. The letters from his family and the community demonstrate his compassionate, generous and caring nature, and his dedication to his family and friends.

Jennifer Betances describes Mr. Suriel as: "an honorable, caring, and valuable member of the community and my family [...]. [...] [H]e has always been a positive influence in the live[s] of those around him." (Exhibit F).

Jennifer's sister, Jessica Betances, similarly shares:

> Despite the rough patches in his life he always remained positive and while others broke he lifted them up. This was especially evident when my grandmother passed away and when he moved in with us after his apartment caught fire. He made it his responsibility to be there for others despite the immense grief he was feeling. It was David Suriel who was my source of strength for all our family. He has a big heart and cares for those around him. In all honesty it is David Suriel's big heart that makes me believe in the good in everyone.

(Exhibit G).

Natalie Betances, another of Mr. Suriel's cousins, writes:

> David has showed a tremendous amount of kindness to my family and I over the years, opened his doors when we had nowhere else to go. [...] David has been a brother and a role model figure to me [...]. David is a kind spirited person who always encourages the best in people.

(Exhibit H).

8

Karlem Landaeta, a longtime friend of Mr. Suriel's fiancée, Chanter Fernandez, describes the positive impact that Mr. Suriel has made on her friend: "David is [...] a caregiver [...]. [...] Thanks to David my friend has learned how to be strong and resilient. [...] David has portrayed personality traits of empathy, kindness, generosity and has always made sure everyone around him is happy." (Exhibit I).

It is these same traits that caused Michelle Betances to choose Mr. Suriel to be the godfather for her children:

> David was always there for us in times of need and opened up the doors of his own home for my sisters and I when we had no place to go [...]. [...] As the godfather of my children he has always been there in times of need. He is someone I've always been able to rely on when I needed him the most.

(Exhibit J).

Andres Medina, a longtime friend of Mr. Suriel's, similarly describes how Mr. Suriel has served as a second parental figure to his 2-year-old daughter whenever his military obligations take him away from home:

> [David] picks her up along with his niece S████ to take them to dinner, movies, the park and toy shopping. While I'm away for military purposes, I can count on him to insure my daughter and fiancée are safe and well taken care of. He takes my fiancée shopping for groceries, makes sure my fiancée and daughter get to their doctors' appointments when I am unable to because of my busy schedule. He embodies everything that comes along with the role of best friend by constantly going above and beyond for myself and my family.

(Exhibit K).

This is echoed by Jairo Lopez, a friend of Mr. Suriel's for the past 15

years:

> David has always carried an outstanding amount of care for helping others and placing the needs of others before his own, willing to go above and beyond to express his level of care and concern for those close to him. […] If there is anything David could do for anyone in need, he will make it his duty to do whatever he can to help out. There have been numerous times that I have witnessed David help out a complete stranger in need […].

(Exhibit L).

Collectively, these letters describe a man who is dependable, caring and generous. He is extremely family-oriented, and eagerly wishes to support Ms. Fernandez and their baby.


b.   *Nature & Circumstances of the Offense*

Mr. Suriel acknowledges the gravity of his offense. He has accepted full responsibility, and has demonstrated appropriate remorse for his misconduct.

While I offer no excuse or justification for Mr. Suriel's misconduct, I have sought to understand how an otherwise kind, hard-working and family-oriented man, who, from the time he was 15, has worked consistently, comes before the Court having committed the instant offense. It appears that the details of Mr. Suriel's history and characteristics are intimately connected to the nature and circumstances of his offense.

In most respects Mr. Suriel's dedication to his family is an admirable quality, for which Mr. Suriel is deserving of much credit. However, in this instance, it acted to his detriment. Mr. Suriel had no personal stake in the

transaction; none of the money belonged to him. He was not involved in planning or orchestrating the transaction, and he was not present for any of the conversations about the transaction or narcotics more generally. The proffer notes for every defendant who engaged in a safety-valve proffer reflect that none of them had met or even heard of Mr. Suriel until he arrived at the hotel with a portion of the money. This is because his involvement was limited and "11th hour."

In recognition of his limited role in delivering the money to the hotel when told to do so, the Probation Department has recommended a minor role reduction for Mr. Suriel.

This does nothing to justify Mr. Suriel's misconduct, and he understands that he is solely to blame for his choices. No detail or opinion I offer the Court is meant to try to excuse the fact that he committed a crime. However, while there is no excuse or justification for Mr. Suriel's misconduct, there can be no doubt that it represents a last-minute aberration in a life underscored by hard work and sacrifice for others.

I believe that Mr. Suriel's arrest and imprisonment, which has taken him away from his fiancée and his baby (whose birth he missed), have given him the perspective to truly understand and appreciate the effects his actions had on a great many people and to realize the steps he needs to take to improve his life and contribute constructively to his family and community.

## IV.  Remaining Factors of 18 U.S.C. § 3553(a)

*a.    The Need for the Sentence Imposed to Reflect the Seriousness
of the Offense, to Provide Just Punishment, to Avoid Unwarranted
Sentence Disparities, and to Promote Respect for the Law*

As the Court reflects upon the person being sentenced, I urge Your Honor to consider that a sentence of time served will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

Mr. Suriel deeply regrets his involvement in the conspiracy. This mistake, however, does not fully define the person being sentenced. The community testimonials written to the Court demonstrate that the requested sentence will promote respect for the law and provide just punishment. They show that Mr. Suriel is a person who is deserving of redemption.

According to Lyanny Betances:

> [David] has always been dependable and has always made it a point to be there for our family in time of need, he has always been a person to show support and aid when needed. David has helped our family overcome many hardships throughout the years. [...] David has always been an honest person with good morals and values who has always strived to excel in life.

(Exhibit M).

This is echoed by Jaelyn Fernandez, Mr. Suriel's sister-in-law:

> He has always given off genuine love and been a positive influence since we've met, and I've been honored to have David apart of my family. [...] From the moment I met David Suriel I got a sincere impression that he was a good and positive influence, along with the way he respected and cared for my sister only made my love for him grow stronger over

time. [...] [H]e's always presented nothing less than decency and respect since we've met.

(Exhibit N).

Mr. Suriel's brother-in-law, Jerry Fernandez, similarly shares: "He's a gentleman and I've always seen as well as heard all the things he's done for my sister. He made sure she was loved, happy, and whenever there was a situation, he was the first one to help and make sure everything was ok." (Exhibit O).

Joel Betances describes Mr. Suriel as "a great honest person" and "the type of person who if you needed help and he was able to help you he would with no questions asked." (Exhibit P).

According to Jaime Chung, Mr. Suriel "puts other people 1st. He constantly tries to better himself, by learning from his mistakes and questioning his actions. He brings joy and happiness to everyone who gets to know him." (Exhibit Q).

And, Damian Lopez writes: "[David] has been a dedicated friend and would always be there for me and my family. David's heart is gold!" (Exhibit R).

These family and community members are but a fraction of the people who support Mr. Suriel[2]. They know how serious this case is, and that the law carries the power to punish him with substantial incarceration, yet they urge the Court to consider a lenient sentence.

For its part, the United States Sentencing Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous

---

[2] Letters not quoted herein are attached as Exhibit W.

13

offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." Alternative Sentencing in the Federal Criminal Justice System, *United States Sentencing Commission*, January 2009, pg. 1. (*See* Exhibit S). Mr. Suriel is just such a first-time, nonviolent offender. At 26 years old, he has lived almost his entire life as a positive and productive member of our community. He does not need a substantial prison sentence to be punished.

Further, in addition to the obvious consequences Mr. Suriel will suffer as a result of any sentence the Court imposes, he will also face numerous collateral consequences, including: "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement." Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010).

As Professor Michelle Alexander has reminded us, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010). As such, Mr. Suriel will no doubt face many additional obstacles as he seeks to reestablish himself in the community following this

case and pursues future employment opportunities. He does not need further imprisonment to understand that his actions have consequences.

 Lastly, the requested sentence would not result in a disparity in sentencing as compared to Mr. Suriel's co-defendants. *See* 18 U.S.C. § 3553(a)(6). To date, the Court has sentenced three of Mr. Suriel's co-defendants. On June 28, 2019, the Court sentenced Jose Jimenez to 366 days imprisonment. On July 19, 2019, the Court sentenced Erwin Roa Mustafa to 24 months imprisonment. And, on July 19, 2019, the Court sentenced Melvin Acosta to 366 days imprisonment.

According to the Government's position on sentencing for defendants Jose Jimenez and Erwin Roa-Mustafa, both of those defendants' Sentencing Guidelines ranges was 70 – 87 months of imprisonment, which reflected their more active roles in the offense. Jimenez and Roa Mustafa met a confidential source and an undercover DEA agent on September 24, 2018 to discuss the purchase of multi-kilogram quantities of cocaine for distribution purposes. Jimenez participated in the negotiations for the purchase of 25 to 27 kilograms of cocaine. Roa-Mustafa agreed to "cut" the cocaine for resale. Then, when it came time for the December 6, 2018 meeting, Jimenez brought $21,091 for the purchase of cocaine. Both of these defendants played significantly more active roles in the conspiracy than did Mr. Suriel, who assisted his brother by delivering money to the hotel when called upon on the day of the December 6, 2018 meeting.

Melvin Acosta is perhaps the defendant whose role most closely approximates Mr. Suriel's. Like Mr. Suriel, Acosta received a minor role reduction; neither one brokered nor facilitated the transaction. It is notable, however, that Acosta made a financial contribution of $12,000 towards the purchase of the cocaine, and as the government argued in their position on sentencing, he did not have the same level of mitigating circumstances as a defendant like Mr. Jimenez. I believe the same is true in comparison to Mr. Suriel's mitigating circumstances. For these reasons, I do not believe the small difference between a time served sentence and the 366 day sentence received by defendant Acosta would represent a disparity.

We understand that comparing defendants like this is an imperfect exercise, and doesn't take into account the unique history and characteristics of each defendant. Nonetheless, we believe that these individuals' sentences provide important context as the Court contemplates a sufficient sentence for Mr. Suriel.

b. *The Requested Sentence Can Provide Adequate Deterrence, and Protect the Public from Future Offenses by Mr. Suriel*

The empirical evidence is clear that there is little relationship between sentence length and general deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring

that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

Studies show that the same is true of specific deterrence; except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and a term of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33Criminology 587 (1995)(finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010)(study of over a thousand offenders whose sentences varied substantially

in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

In fact, it appears that among low-risk offenders, recidivism may, to a limited extent, be fostered, not prevented, by lengthy imprisonment:

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Wright, *supra,* at 7.

Respectfully, Mr. Suriel is a low-risk offender who does not need to be incapacitated beyond the requested sentence to be deterred.

As an initial matter, research indicates low recidivism rates for offenders with no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender': A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004.  (*See* Exhibit T). In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders

> who have little or no prior criminal conduct. This
> philosophy, which can be derived directly from the
> guidelines' Chapter Four introductory commentary,
> postulates that first offenders are less culpable and
> less likely to re-offend.

(Exhibit T, p. 1); *see also* 28 U.S.C. § 994(j).

The U.S.S.C. found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points).  (*See* Exhibit T, p. 13-14, 26).

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under §4A1.2(c)(2)).  (*See* Exhibit T, p. 14, 26).

The U.S.S.C. notes:

> Its low recidivism rate makes first offender group A
> stand out.  Recall that group A offenders have no prior
> criminal events, not even a prior arrest.

(Exhibit T, p. 14).

Prior to this case, Mr. Suriel had never been arrested in his 26 years. He has lived a thoroughly law-abiding life. He has worked successfully since he was 15 years old. He has been a good son, brother, friend and partner. He has contributed meaningfully to his family and community. And now, he is ready to be a good husband and father to Ms. Fernandez and his baby boy.

19

For the past nine months, he has been a model inmate and he has taken advantage of this opportunity to engage in much needed reflection and self-rehabilitation.

Those around Mr. Suriel know that he will never make a mistake like this again. As reflected in his letters of support, he has learned an important lesson from this experience and is determined to work hard, be of service to his community, and focus on providing for his family.

According to Mr. Suriel's half-sister, Yahaira Suriel:

> I know he has learned from this and grown from it. When I speak to him he tells me how regretful he is and how not being able to meet his child has been very hard on him and he said nothing in this world can make him lose that opportunity again. He talks about finishing his courses and how he will be the best dad for him.

(Exhibit U).

Natalie Betances similarly shares: "I am confident that he is willing and prepared to make any changes necessary to move forward and right his wrongs. [...] I believe that moving forward he will become a stronger and wiser aspect of society and will learn from his mistakes." (Exhibit H).

This is echoed by Lyanny Betances: "I believe that this experience has made him reflect on life. [...] I am confident that he is willing and prepared to make any changes needed. I believe that moving forward he will become a stronger character and continue to be a positive influence in the society." (Exhibit M).

And, Mr. Suriel's mother, Juana Betances, writes: "I know my son has learned a lot this whole time he has spent incarcerated. We all go through hardships in life in order to grow and I believe this was it for David Suriel. He will come out a new man ready to start an honest living and a good father for his son O███ D███ S███." (Exhibit V).

Respectfully, the public does not need protection from Mr. Suriel. His remorse, lack of criminal history, strong history of employment, desire to present for his fiancée and young son and his anticipated supervised release, all make him unlikely to reoffend. And, as demonstrated by the letters of support, Mr. Suriel has a devoted family and community who are willing to do everything in their power to support him to become all that he can be.

For all of the above reasons, I respectfully suggest that a sentence of time served (9.5 months) is sufficient but not greater than necessary to achieve the objectives of sentencing.

## V.  Conclusion

On behalf of Mr. Suriel and his family, I thank the Court for taking the time to consider our position on sentencing. We look forward to addressing the Court on September 27, 2019.

Respectfully submitted,

DAVID JAYRET SURIEL
By Counsel

Edward V. Sapone
Sapone & Petrillo, LLP
One Penn Plaza, Suite 5315
New York, NY 10119
(212) 349-9000
ed@saponepetrillo.com

Darwyn L. Easley
Local Counsel
Virginia Bar No. 48250
10521 Judicial Drive, Suite 205
Fairfax, VA 22030
(703) 865-6610
dle@easleyfirm.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Notice was filed by CM/ECF on the 13th day of September 2019, which will send a notification of such filing (NEF) to counsel of record.

/s/ Darwyn L. Easley
_____
Darwyn L. Easley